United States Bankruptcy Court
Northern District of California

In re:  Case No. 12-58296 ASW
 Chapter 11
Danielle Frankina and
Thomas Frankina

_____/

**PROPOSED COMBINED PLAN OF REORGANIZATION
AND DISCLOSURE STATEMENT
June 7, 2013**

**INTRODUCTION**

This is Debtor's Combined Chapter 11 Plan of Reorganization and Disclosure Statement (the Plan). The Plan identifies each known creditor by name and describes how each claim will be treated if the Plan is confirmed.

Part 1 contains the treatment of creditors with secured claims; Part 2 contains the treatment of general unsecured creditors: a pro rata portion of return from litigation if successful, amount anticipated is $2,000,000.00. Payments to unsecured creditors will be made once the litigation is resolved and funds from the litigation are received. Debtors will bear the cost of litigation. Unsecured creditors will receive payment in a single lump sum payment. If the litigation is successful to the extent anticipated above, unsecureds will receive 100% repayment. Taxes and other priority claims would be paid in full, as shown in Part 3. Debtor filed the State Court Litigation against Big O Tires on June 6, 2013, Case No. 1-13-CV-247486.

Most creditors (those in impaired classes) are entitled to vote on confirmation of the Plan. Completed ballots must be received by Debtor's counsel, and objections to confirmation must be filed and served, no later than [date]. The court will hold a hearing on confirmation of the Plan on [date] at [time].

Attached to the Plan are exhibits containing financial information that may help you decide how to vote and whether to object to confirmation. Exhibit 1 includes background information regarding Debtor and the events that led to the filing of the bankruptcy petition and describes significant

events that have occurred during this Chapter 11 case. Exhibit 2 contains an analysis of how much creditors would likely receive in a Chapter 7 liquidation. Exhibit 3 shows Debtor's monthly income and expenses. Exhibit 4 describes how much Debtor is required to pay on the effective date of the plan.

Whether the Plan is confirmed is subject to complex legal rules that cannot be fully described here. You are strongly encouraged to read the Plan carefully and to consult an attorney to help you determine how to vote and whether to object to confirmation of the Plan.

If the Plan is confirmed, the payments promised in the Plan constitute new contractual obligations that replace the Debtor's pre-confirmation debts. Creditors may not seize their collateral or enforce their pre-confirmation debts so long as Debtor performs all obligations under the Plan. If Debtor defaults in performing Plan obligations, any creditor can file a motion to have the case dismissed or converted to a Chapter 7 liquidation, or enforce their non-bankruptcy rights. Debtor will be discharged from all pre-confirmation debts (with certain exceptions) if Debtor makes all Plan payments. Enforcement of the Plan, discharge of the Debtor, and creditors' remedies if Debtor defaults are described in detail in Parts 5 and 6 of the Plan.

**PART 1: TREATMENT OF SECURED CREDITORS**

**Property to be Surrendered.**

| Class | Name of Creditor | Description of Collateral |
|---|---|---|
| 1A | Carrington Mortgage (First Mortgage Holder) | Family Residence Located at 2065 Pacheco Pass Road, Gilroy, CA 95020 |
| 1B | GMAC Mortgage (Second Mortgage Holder) | Family Residence Located at 2065 Pacheco Pass Road, Gilroy, CA 95020 |
| 1C | BBCN Bank (Formerly NARA Bank) (SBA Loan - Third Lien) | Family Residence Located at 2065 Pacheco Pass Road, Gilroy, CA 95020 |
| 1D | Santa Clara County Property Tax Assessor | Family Residence Located at 2065 Pacheco Pass Road, Gilroy, CA 95020 |

Debtor will surrender the above collateral on the Effective Date of the Plan. The confirmation order will constitute an order for relief from stay. Any secured claim is satisfied in full through surrender of the collateral. Any deficiency claim is a general unsecured claim treated in Part 2. Creditors in these classes shall retain their interest in the collateral.

Secured Creditors in Class 1A and 1D are not impaired and are not entitled to vote on confirmation of the Plan. The remaining creditors in Class 1B and 1C are entitled to vote as Unsecured Creditors in PART 2.

**Creditors' Rights Remain Unchanged.**

| Class | Name of Creditor | Description of Collateral |
|---|---|---|
| 2A | Patelco Credit Union | 2007 Jeep Wrangler |
| | | |

This creditor's legal, equitable, and contractual rights remain unchanged with respect to the above collateral. The confirmation order will constitute an order for relief from stay. Creditors in this class shall retain its interest in the collateral until paid in full. **This secured claim is not impaired and is not entitled to vote on confirmation of the Plan.**

**PART 2: TREATMENT OF GENERAL UNSECURED CREDITORS**

**Class 2. General Unsecured Claims.**

| Name of Creditor | Amount of Claim | Disputed Y/N | Amount to be Paid | Total Claims |
|---|---|---|---|---|
| See Exhibit 5 For Table | | | | $1,454,496 |
| | | | | |
| | | | | |

Allowed claims of general unsecured creditors (including allowed claims of creditors whose executory contracts or unexpired leases are being rejected under this Plan) shall be paid as follows:

> **Pot Plan.** Creditors will receive a pro rata portion of return from litigation, if successful, amount anticipated is $2,000,000.00. Payments to unsecured creditors will be made once the litigation is resolved and funds from the litigation are received. Unsecured creditors will receive payment in a single lump sum payment. If the litigation is successful to the extent anticipated above, unsecureds will receive 100% repayment. Pro-rata means the entire amount of the fund divided by the entire amount owed to creditors with allowed claims in this class. Debtors will bear the cost of the litigation.

Creditors in this class may not take any collection action against Debtor so long as Debtor is not in material default under the Plan (defined in Part 6(c)). **This class is impaired and is entitled to vote on confirmation of the Plan.** Debtor has indicated above whether a particular claim is disputed.

**PART 3: TREATMENT OF PRIORITY AND ADMINISTRATIVE CLAIMS**

(a) <u>Professional Fees.</u>

Debtor will pay the following professional fees in full on the Effective Date, or upon approval by the court, whichever is later.

| Name and Role of Professional | Estimated Amount |
|---|---|
| Diemer, Whitman & Cardosi, LLP - Attorney for Debtors | $8,954.00 (paid from monies held in trust by DWC) |
| Diemer, Whitman & Cardosi, LLP - Attorney for Debtors | $2,000 (first installment payment) |

The following professionals have agreed to accept payment over time as follows. Payments will be made monthly, due on the 15 day of the month, upon approval by the court. Diemer, Whitman & Cardosi, LLP has agreed represent Debtors in the State Court litigation. DWC estimates the litigation will cost approximately $36,000.00, including fees incurred during the pendency of the instant bankruptcy not covered by the initial retainer amount set forth above.

| Name and Role of Professional | Estimated Amount | Payment Amount | Number of Payments |
|---|---|---|---|
| Kathryn S. Diemer, Diemer, Whitman & Cardosi, LLP - Attorney for Debtors and Plaintiffs | $36,000 | $2,000 | 18 |

Professionals may not take collection action against Debtor so long as Debtor is not in material default under the Plan (defined in Part 6(c)). **Estate professionals are not entitled to vote on confirmation of the Plan.**

(b) <u>Other Administrative Claims</u>.  Debtor will pay other allowed claims entitled to priority under section 503(b) in full on the Effective Date; except expenses incurred in the ordinary course of Debtor's business or financial affairs, which shall be paid when normally due and payable (these creditors are not listed below).  All fees payable to the United States Trustee as of confirmation will be paid on the Effective Date; post-confirmation fees to the United States Trustee will be paid when due.

Administrative Creditors may not take any collection action against Debtor so long as Debtor is not in material default under the Plan (defined in Part 6(c)).  **Administrative claimants are not entitled to vote on confirmation of the Plan.**

| Name of Administrative Creditor | Estimated Amount of Claim |
|---|---|
| None. | |
| | |

(c) <u>Tax Claims</u>.  Debtor will pay allowed claims entitled to priority under section 507(a)(8) in full over time with interest (at the non-bankruptcy statutory interest rate) in equal amortizing payments in accordance with section 511 of the Bankruptcy Code.  Debtors will make a one-time payment in full on the Effective Date.  To the extent amounts owed are determined to be other than as shown below, appropriate adjustments will be made in the number of payments.

Priority tax creditors may not take any collection action against Debtor so long as Debtor is not in material default under the Plan (defined in Part 6(c)).  **Priority tax claimants are not entitled to vote on confirmation of the Plan.**

| Name of Creditor | Estimated Amount of Claim | Statutory Interest Rate | Payment Amount | Number of Payments |
|---|---|---|---|---|
| State Board of Equalization | $5,385 | 4% | $5,385.00 | 1 |
| | | | | |

**PART 4:   EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

(a) <u>Executory Contracts/Unexpired Leases Assumed</u>.  Debtor assumes the following executory contracts and/or unexpired leases upon confirmation of this Plan and will perform all pre-confirmation and post-confirmation obligations thereunder.  Post-confirmation obligations will be paid as they come due.

| Name of Counter-Party | Description of Contract/Lease | Estimated Total Cure Amount | Installment Amount | Number of Installments |
|---|---|---|---|---|
| None | | | | |
| | | | | |

(b) <u>Executory Contracts/Unexpired Leases Rejected</u>.  Debtor rejects the following executory contracts and/or unexpired leases and surrenders any interest in the affected property, and allows the affected creditor to obtain possession and dispose of its property, without further order of the court.  Claims arising from rejection of executory contracts have been included in Class 2 (general unsecured claims).

| Name of Counter-Party | Description of Contract/Lease |
|---|---|
| None | |
| | |

(c) Executory contracts and unexpired leases not specifically assumed or rejected above will be deemed rejected.


**PART 5: DISCHARGE AND OTHER EFFECTS OF CONFIRMATION**

(a)  <u>Discharge</u>.  Debtor shall not receive a discharge of debts until Debtor makes all payments due under the Plan or the court grants a hardship discharge.

(b)  <u>Vesting of Property</u>.  On the Effective Date, all property of the estate and interests of the Debtor will vest in the reorganized Debtor pursuant to § 1141(b) of the Bankruptcy Code free and clear of all claims and interests except as provided in this Plan, subject to revesting upon conversion to Chapter 7 as provided in Part 6(f) below.

(c)  <u>Plan Creates New Obligations</u>.  Except as provided in Part 6(d) and (e), the obligations to creditors that Debtor undertakes in the confirmed Plan replace those obligations to creditors that existed prior to the Effective Date of the Plan.

Debtor's obligations under the confirmed Plan constitute binding contractual promises that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under California law. To the extent a creditor retains a lien under the Plan, that creditor retains all rights provided by such lien under applicable non-Bankruptcy law.

**PART 6: REMEDIES IF DEBTOR DEFAULTS IN PERFORMING THE PLAN**

(a) <u>Creditor Action Restrained</u>. The confirmed Plan is binding on every creditor whose claims are provided for in the Plan. Therefore, even though the automatic stay terminates on the Effective Date with respect to secured claims, no creditor may take any action to enforce either the pre-confirmation obligation or the obligation due under the Plan, so long as Debtor is not in material default under the Plan, except as provided in Part 6(e) below.

(b) <u>Obligations to Each Class Separate</u>. Debtor's obligations under the Plan are separate with respect to each class of creditors. Default in performance of an obligation due to members of one class shall not by itself constitute a default with respect to members of other classes. For purposes of this Part 6, the holders of all administrative claims shall be considered to be a single class, the holders of all priority claims shall be considered to be a single class, and each non-debtor party to an assumed executory contract or lease shall be considered to be a separate class.

(c) <u>Material Default Defined</u>. If Debtor fails to make any payment, or to perform any other obligation required under the Plan, for more than 10 days after the time specified in the Plan for such payment or other performance, any member of a class affected by the default may serve upon Debtor and Debtor's attorney (if any) a written notice of Debtor's default. If Debtor fails within 30 days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the court an extension of time to cure the default; or (iii) to obtain from the court a determination that no default occurred, then Debtor is in Material Default under the Plan to all the members of the affected class.

(d) <u>Remedies Upon Material Default</u>. Upon Material Default, any member of a class affected by the default: (i) may file and serve a motion to dismiss the case or to convert the case to Chapter 7; or (ii) without further order of the court has relief from stay to the extent necessary, and may pursue its lawful remedies to

enforce and collect Debtor's pre-confirmation obligations.

(e) <u>Claims not Affected by Plan</u>. Upon confirmation of the Plan, and subject to Part 5(c), any creditor whose claims are left unimpaired under the Plan may, notwithstanding paragraphs (a), (b), (c), and (d) above, immediately exercise all of its contractual, legal, and equitable rights, except rights based on default of the type that need not be cured under section 1124(2)(A) and (D).

(f) <u>Effect of Conversion to Chapter 7</u>. If the case is at any time converted to one under Chapter 7, property of the Debtor shall vest in the Chapter 7 bankruptcy estate to the same extent provided for in section 348(f) of the Bankruptcy Code upon the conversion of a case from Chapter 13 to Chapter 7.

(g) <u>Retention of Jurisdiction</u>. The bankruptcy court may exercise jurisdiction over proceedings concerning: (i) whether Debtor is in Material Default of any Plan obligation; (ii) whether the time for performing any Plan obligation should be extended; (iii) adversary proceedings and contested matters pending as of the Effective Date or specifically contemplated in this Plan to be filed in this court (see Part 7(f)); (iv) whether the case should be dismissed or converted to one under Chapter 7; (v) any objections to claims; (vi) compromises of controversies under Fed. R. Bankr. Pro. 9019; (vii) compensation of professionals; and (viii) other questions regarding the interpretation and enforcement of the Plan.

**PART 7: GENERAL PROVISIONS**
(a) <u>Effective Date of Plan</u>. The Effective Date of the Plan is the fifteenth day following the date of the entry of the order of confirmation, if no notice of appeal from that order has been filed. If a notice of appeal has been filed, Debtor may waive the finality requirement and put the Plan into effect, unless the order confirming the Plan has been stayed. If a stay of the confirmation order has been issued, the Effective Date will be the first day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

(b) <u>Disputed Claim Reserve</u>. Debtor will create a reserve for disputed claims. Each time Debtor makes a distribution to the holders of allowed claims, Debtor will place into a reserve the amount that would have been distributed to the holders of disputed claims if such claims had been allowed in the full

amount claimed. If a disputed claim becomes an allowed claim, Debtor shall immediately distribute to the claimant from the reserve an amount equal to all distributions due to date under the plan calculated using the amount of the allowed claim. Any funds no longer needed in reserve shall be [select one] [returned to Debtor] [distributed pro-rata among allowed claims in this class].

(c) <u>Cramdown</u>. Pursuant to section 1129(b) of the Bankruptcy Code, Debtor reserves the right to seek confirmation of the Plan despite the rejection of the Plan by one or more classes of creditors.

(d) <u>Severability</u>. If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

(e) <u>Governing Law</u>. Except to the extent a federal rule of decision or procedure applies, the laws of the State of California govern the Plan.

(f) <u>Lawsuits</u>.

Debtor believes that causes of action for fraudulent transfers, voidable preferences, or other claims for relief exist against the following parties:

| Party | Creditor Y/N | Nature of Claim | Amount of Claim | Will Debtor Prosecute Action? Y/N |
|---|---|---|---|---|
| Big O Tires | Y | Tortious interference and breach of contract | $2,000,000 | Y – Santa Clara Superior Court Case No. 1-13-CV-247486 |
|  |  |  |  |  |

(g) <u>Notices</u>. Any notice to the Debtor shall be in writing, and will be deemed to have been given three days after the date sent by first-class mail, postage prepaid and addressed as follows:

Danielle and Thomas Frankina
550 Moreland Way, #3113
Santa Clara, CA 95054-4123

Kathryn S. Diemer
Diemer, Whitman & Cardosi, LLP
75 E. Santa Clara Street, Suite 290
San Jose, CA 95113

(h) <u>Post-Confirmation United States Trustee Fees</u>. Following confirmation, Debtor shall continue to pay quarterly fees to the United States Trustee to the extent, and in the amounts, required by 28 U.S.C. § 1930(a)(6). So long as Debtor is required to make these payments, Debtor shall file with the court quarterly reports in the form specified by the United States Trustee for that purpose.

(i) <u>Deadline for § 1111(b) Election</u>. Creditors with an allowed secured claim can make a timely election under section 1111(b) no later than 14 days before the first date set for the hearing on confirmation of the Plan.

Dated: 7/7/13

Danielle Frankina

Dated: 7/7/13

Thomas Frankina

Dated: June 7, 2013

/s/ Kathryn S. Diemer
Attorney for Debtors

Individual Chapter 11
Combined Plan & Disclosure Statement
June 7, 2013                       10                    (Version: 7/30/12)

## Attorney Certification

I, ‎ Kathryn S. Diemer ‎ , am legal counsel for the Debtors in the above-captioned case and hereby certify the following: (i) the foregoing plan is a true and correct copy of the Individual Chapter 11 Combined Plan and Disclosure Statement promulgated by the Northern District of California, San Francisco Division, on May 28, 2013 (the "Standard-Form Plan"); and (ii) except as specified below, there have been no alterations or modifications to any provision of the Standard-Form Plan.

The following provisions of the Standard-Form Plan have been altered or otherwise modified.

> The Plan has been modified to reflect that it is a litigation plan. The "Pot" will be determined by the outcome of the litigation in California Superior Court filed on June 6, 2013, Case No. 1-13-CV-247486.

I declare that the foregoing is true and correct. Executed this 7th day of ‎ June, 2013 ‎ .

‎ /s/Kathryn S. Diemer ‎

Attorney for Debtors

**Exhibit 1 - Events That Led To Bankruptcy**

Debtors purchased a Big O Tires franchise in September of 2007. The franchise was to provide Debtors with a source of retirement income. There were several buyers making offers on the business. Debtors had to be approved by Big O Tires (hereinafter BOT) in order to qualify as a franchisee. Debtors had no problem qualifying. Mrs. Frankina wrote the business plan and Debtors secured an SBA loan. In addition to the SBA loan, Debtors had savings that they believed were sufficient, along with the SBA loan, to capitalize the business. BOT made specific statements about the location, including statements about what needed to change to attract customers. BOT and the business broker who handled the sale made statements about how many of the fees, fines and expenses that impaired the previous owners ability to operate at a profit would not be an issue for Debtors. Debtors felt fairly confident about the success of the business considering Mr. Frankina's training and certifications from DeAnza college, combined with Ms. Frankina's background in finance and business management, and Mr. Frankina's training by BOT prior to the opening of the store.

The prior owner, pursuant to his contract with BOT, was required to remodel bathrooms, paint logs, walls etc. He refused to do so, and BOT forced the Frankinas to do the work, along with forcing them to pay the associated costs. BOT caused the Frankinas to expend significant unanticipated costs, all in the name of allegedly increasing traffic to the store, and sales. Those costs included participating in programs involving hanging balloons, participating in 3 for 1 sales, freebies, and other programs. Those programs all required the Frankinas to pay funds to BOT. The programs did not change the traffic or incease profitability for the Frankinas, although the programs clearly benefitted BOT.

The Frankinas were required to attend monthly BOT franchise meetings. At the meetings it became clear that BOTs statements about a variety of items were not accurate, and that the franchisees as a group were concerned about the lack of promotion for advertising dollars, empty promises, unfair competition advantages, and overinflated prices for inventory. BOT appeared to use the franchise meetings as a forum to announce programs which would require the Frankinas to participate in programs which benefitted BOT, but did not provide what was promised in terms of revenue or assistance in increasing revenue for the Frankinas or other franchisees. For example, during operation of the business BOT required the Frankinas to buy inventory in excess of what was needed.

Despite the statements made by BOT and the business broker prior to the purchase, and even during the relationship, BOT, and the area manager did not support the venture as stated. The area manager blamed the lack of increasing sales to the Frankina's alleged failure to comply with every BOT program, request, or meeting that the Frankina's could not attend. Debtors' requests for help or direction were usually met with, "Well if you had done this, or attended this, you would be successful." The attitude of the area manager appeared to be a BOT directed policy, across multiple local franchises.

Eventually BOT's area manager insisted that the Frankinas and other franchisees participate in a program where they paid higher royalties. When the Frankinas, along with others complained that this was going to hurt franchise profitability, BOT's agent informed them that "Look, BOT is hurting for money, based on your sales and statistics, the program would only cost

you about $800.00 per month." Debtors started hearing complaints from other stores that the new program was creating an unbalanced pricing model and an unfair competitive advantage between franchisees. Additionally, the Frankinas became aware that the advertising dollars were not being spent as they understood they would be, to benefit their store, and other South Bay stores. Rather, the promotional funds were benefitting other geographical areas.

BOT made statements both before and during the relationship with the Frankinas about program which BOT stated would benefit the franchisees, and generate revenue. In fact, many of the programs did the opposite, because they were either too vague, or caused the franchisees to look dishonest. Examples included 1) the common buy 3 tires get 1 free program. The franchisee would pay the cost for the fourth tire, BOT would pass on no savings to either the customer or the franchisee. 2) The TPP program where if a customer bought this program, if a tire was damaged, defective, flat, no matter what, they brought it to a dealer and the tire was replaced free of charge. The dealer had to send the tire in and if it fell under the tire replacement guidelines you were reimbursed the cost. 9 out of 10 times, the franchisee was never under the guidelines. The Franchisee was just supposed to replace any other dealer's customers' tires, even though they had not profited from the original sale.

BOT obligated Debtor to follow certain guidelines, but allowed other franchisees exceptions, exceptions which would have rendered Debtors' store more profitable. For example, BOT allowed another store to have a smog station, but not debtors. BOT allowed another store owner to post negative reviews on Yelp.com about his competitor franchisees. Based upon recommendations, Debtors hired a sales manager as a last ditch effort to save the business. Unfortunately, the cost of the sales manager in the form of a significant salary and commission were too high to generate profits from the increased sales.

Debtors investigated converting to another corporate tire franchise, along with a number of other franchisees. Mr. Frankina attended the meeting, only to find one of BOTs area managers with a clip board outside the meeting taking names and informing attendees of the legal issues they would face.

Debtors asked for help from BOT, but were told, after BOT asked for copies of Debtors financials, that there was nothing wrong, except attitude. Debtors later discovered that there were significant problems with the profitability of their store, prior to the purchase, which had not been, they feel adequately disclosed.

In mid-2011, Debtors felt that they had to try and sell the store to try and pay off their vendors and save their credit. Debtors had lost all of their savings, had taken loans against their 401K, had no equity in their home and had maxed out several credit cards. Debtors did some research and felt that they could try and list the store as cheaply as possible, and perhaps walk away without owing anyone, but themselves. Debtors listed the store with the same broker and brokerage who they had bought the store from. Debtors provided current financials to the broker. The Broker reviewed the financials and told Debtors they needed to be "beefed up." The Broker said that without showing a profit, there would be little chance of selling. None the less, Debtors listed the business on their own and had several people interested. Debtors contacted BOT and let them know they were attempting to sell the store. Debtors sent the communications via email. The

first response that I got was very vague. There was no support offered. BOT questioned Debtors' current financial situation and the fact that they were behind on royalties.

Debtors asked BOT to please work with them while they attempted to sell the store and pay off their creditors. There were two individuals who had signed a Non-disclosure Agreement and who were working on, or had partial financing available. The next email from the finance team at BOT was to let Debtors know that BOT would no longer sell the Debtors tires. Debtors had been paying COD for quite some time, so there was no cause for BOT to cease selling them tires. Debtors sent a follow up email questioning why they were doing this and asked how they were supposed to sell the store as a BOT, if it was not allowed to purchase the product. The reply was simply the BOT would no longer sell Debtors product period. Mrs. Frankina emailed BOT that if they continued to take such an aggressive position, Debtors would have no choice but to file for bankruptcy. BOT did not reply.

As a result of BOT's fraudulent and malicious business practices Debtors were forced to file their Big O Tire Franchise for Chapter 7 bankruptcy protection. Debtors were being sued personally by Big O Tires and NARA Bank, the holder of Debtors' SBA loan. Debtors had personally guaranteed many of the franchise's debts and had no ability to pay all of the creditors who demanded payment after their franchise declared bankruptcy. For all of the reasons set forth above, Debtors were forced to file the instant Chapter 11 bankruptcy.

Individual Chapter 11
Combined Plan & Disclosure Statement (Version: 7/30/12)
June 7, 2013

Case: 12-58296   Doc# 49   Filed: 06/10/13   Entered: 06/10/13 11:58:07   Page 14 of 19

# Exhibit 2 - What Creditors Would Receive if the Case Were Converted to a Chapter 7

Real Property #1: Family Residence, 2065 Pacheco Pass Road, Gilroy, CA 95020

| Fair Market Value | Liens | | Cost of Sale | Resulting Income Tax | Amt of Exemption | Net Proceeds |
|---|---|---|---|---|---|---|
| 566,866.00 | 1st | 669,127 | $56,000.00 | $0.00 | $0.00 | $0.00 |
| | 2nd | 226,852 | | | | |
| | 3rd | 235,000 | | | | |

Personal Property:

| Description | Liquidation Value | Secured Claim | Amt of Exemption | Net Proceeds |
|---|---|---|---|---|
| Cash and Checking | $1,621.00 | $0.00 | $1,621 | $0.00 |
| Automobile #1 - 2003 Mercedes CLK | $6,500 | $0.00 | $6,500 | $0.00 |
| Automobile #2 - 2002 Dodge Durango | $4,500 | $0.00 | $4,500 | $0.00 |
| Automobile #3 - 2005 Harley Davidson | $8,500 | $0.00 | $8,500 | $0.00 |
| Automobile #4 - 2007 Jeep Wrangler | $14,000 | $0.00 | $1,579.00 | $12,421 |
| Residential Vehicle (RV) 1994 Southwind | $3,500 | $0.00 | $3,500.00 | $0.00 |
| Household Furnishings | $1,500 | $0.00 | $1,500.00 | $0.00 |
| Jewelry | $2,500 | $0.00 | $2,500.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 | $0.00 |
| Stocks / Investments - ING 401(k) | $45,520.54 | $0.00 | $45,520.54 | $0.00 |
| Other Personal Property | $1,250.00 | $0.00 | $1,250.00 | $0.00 |
| TOTAL | | | | $12,421 |

| | | |
|---|---|---|
| Net Proceeds of Real Property and Personal Property | | $12,421 |
| Recovery from Preferences / Fraudulent Conveyances | [ADD] | $0.00 |
| Chapter 7 Administrative Claims | [SUBTRACT] | $0.00 |
| Chapter 11 Administrative Claims | [SUBTRACT] | $36,000 |
| Priority Claims | [SUBTRACT] | $5,385 |
| Chapter 7 Trustee Fees | [SUBTRACT] | $1,242.10 |

Individual Chapter 11
Combined Plan & Disclosure Statement (Version: 7/30/12)
June 7, 2013

| | | |
|---|---|---|
| Chapter 7 Trustee's Professionals | [SUBTRACT] | $3,000.00 |
| NET FUNDS AVAILABLE FOR DISTRIBUTION TO UNSECURED CREDITORS | | ($33,206) |

| | |
|---|---|
| Estimated Amount of Unsecured Claims | $1,454,496 |
| Percent Distribution to Unsecured Creditors Under Proposed Plan | 100%* |
| Percent Distribution to Unsecured Creditors Under Liquidation Analysis | 0.00% |

*** 100% if Debtors' Litigation is successful. The percentage will be less if the case is settled for an agreed upon lesser amount, or adversely resolved.**

# Exhibit 3 - Monthly Income and Expenses

| Income | Amount |
|---|---|
| Wife's Gross Employment Income | $16,667.00 |
| Husband's Gross Business Income | $2,300.00 |
| **A. Total Monthly Income** | $18,967.00 |

| Expenses<br>Includes Plan Payments on Secured Claims for Residence and Car | Amount |
|---|---|
| Payroll Taxes and Related Withholdings | $7,533.00 |
| Retirement Contributions (401k, IRA, PSP) | $1,885.00 |
| Shelter Expenses (rent/mortgage, insurance, taxes, utilities) | $4,615.00 |
| Household Expenses (food) | $1,500.00 |
| Transportation Expenses (car payments, insurance, fuel) | $575.00 |
| Personal Expenses (e.g. recreation, clothing, laundry, medical) | $700.00 |
| Alimony / Child Support | $0.00 |
| Other Expenses | |
| Negative Cash Flow on Investment Property (Exhibit 5, Line B) | $0.00 |
| **B. Total Monthly Expenses** | $16,808.00 |

| **C. Disposable Income** (Line A - Line B) | $2,159.00 |
|---|---|

| Plan Payments<br>Plan Payments Not Included in Calculating Disposable Income | Amount |
|---|---|
| Administrative Claims | $36,000 |
| Priority Claims | $5,385 |
| General Unsecured Creditors | Determined by Litigation |
| [OTHER PLAN PAYMENTS - DESCRIBE] | |
| **D. Total Plan Payments** | Determined by Litigation |

| **E. Plan Feasibility** (Line C - Line D)<br>(Not feasible if less than zero) | Payment will be made on Effective Date from money in DIP account – See Exhibit 4 |
|---|---|

Individual Chapter 11
Combined Plan & Disclosure Statement
June 7, 2013

(Version: 7/30/12)

**Exhibit 4 - Effective Date Feasibility**

Can the Debtor Make the Effective Day Payments?

|  | Amount | Amount |
|---|---|---|
| A. Projected Total Cash on Hand on Effective Date |  | $38,000 |
| Payments on Effective Date |  |  |
| Unclassified Claims |  |  |
| Administrative Expense Claims | $2,000 |  |
| Priority Claims | $5,385 |  |
| Small Claims (Class 2(a)) |  |  |
| U.S. Trustee Fees |  |  |
| B. Total Payments on Effective Date |  | $7,385 |
| C. **Net Cash on Effective Date** (Line A - Line B) (Not feasible if less than zero) |  | $30,615 |

**EXHIBIT 5 - Class 2. General Unsecured Claims.**

| Name of Creditor | Amount of Claim | Disputed Y/N | Amount to be Paid | Monthly/ Quarterly Payment |
|---|---|---|---|---|
| All Data | $566.32 | N | Dependent upon Litigation | Single Payment |
| American Express Bank, FSB Claim No. 8 | $82,442.04 | N | Dependent upon Litigation | Single Payment |
| Autozone, Inc. Claim No. 10 | $929.73 | N | Dependent upon Litigation | Single Payment |
| Bank of America | $46,374.00 | N | Dependent upon Litigation | Single Payment |
| Big O Tires – AR/ROY Claim No. 4 | $28,225.23 | N | Dependent upon Litigation | Single Payment |
| Big O Tires – Mkt Group | $9,384.00 | N | Dependent upon Litigation | Single Payment |
| Big O Tires – Asher Dolle | $1,765.00 | N | Dependent upon Litigation | Single Payment |
| Capital One Bank (USA), NA Claim No. 6 | $18,715.16 | N | Dependent upon Litigation | Single Payment |
| CBNA | $1,084.00 | N | Dependent upon Litigation | Single Payment |
| City of Santa Clara | $487.00 | N | Dependent upon Litigation | Single Payment |
| City of Santa Clara – License Division | $1,885.00 | N | Dependent upon Litigation | Single Payment |
| Santa Clara Tax Collector | $1,975.00 | N | Dependent upon Litigation | Single Payment |
| Jamie Wang and Teresa Chuang | $22,426.29 | N | Dependent upon Litigation | Single Payment |
| Lakin Tire West | $716.00 | N | Dependent upon Litigation | Single Payment |
| Dept. Stores National Bank /Macy's Claim No. 1 | $2,785.27 | N | Dependent upon Litigation | Single Payment |
| Patelco Credit Union | $4,624.00 | N | Dependent upon Litigation | Single Payment |
| TCI – Tire Centers | $2,797.62 | N | Dependent upon Litigation | Single Payment |
| Tech Distribution and Supply | $676.32 | N | Dependent upon Litigation | Single Payment |
| Wells Fargo Business Direct Division | $16,700.00 | N | Dependent upon Litigation | Single Payment |
| Wheel Pros | $1,279.26 | N | Dependent upon Litigation | Single Payment |
| FIA Card Services, NA Claim No. 2 | $50,060.61 | N | Dependent upon Litigation | Single Payment |
| Deutsche Bank National Trust Co. Claim No. 3 | $689,329.47 | N | Dependent upon Litigation | Single Payment |
| Green Tree Servicing LLC Claim No. 5 | $230,123.05 | N | Dependent upon Litigation | Single Payment |
| BBCN Bank Claim No. 9 | $239,145.62 | N | Dependent upon Litigation | Single Payment |
| **Total:** | **$1,454,496** | | | |